Ashton C. Jones, Jr. v. Commissioner. Jack R. Jones and Helen M. Jones v. Commissioner.
Jones v. Commissioner
Docket Nos. 110373, 110374.
United States Tax Court
1943 Tax Ct. Memo LEXIS 395; 1 T.C.M. (CCH) 816; T.C.M. (RIA) 43141; March 22, 1943
*395 John C. Ristine, Esq., 920 Southern Bldg., Washington, D.C., for the petitioners. E. M. Woolf, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated proceedings were brought for a redetermination of income tax deficiencies for the year 1939 as follows: Ashton C. Jones, Jr
$261.49
Jack R. Jones and Helen M. Jones
28.80
Determination of the issue is dependent upon whether certain real estate sold during the taxable year was held by Ashton C. and Jack R. Jones primarily for sale to customers in the ordinary course of their trade or business within the meaning of section 117(a) of the Internal Revenue Code. Findings of Fact The stipulated facts are found; facts hereinafter appearing which are not from the stipulation are facts otherwise found from the record. Jack R. Jones and Ashton C. Jones, Jr. are brothers. For convenience, they will hereafter be referred to as "petitioners." Helen M. Jones is the wife of Jack R. Jones. In 1937 petitioners entered into an oral joint venture or partnership designated as Jones and Jones. For the year in question, the partnership and the individuals kept their books and made their Federal *396 income tax returns, which were filed with the collector of internal revenue at Richmond, Virginia, on a cash basis. The property which was the original subject matter of the joint venture or partnership was improved real property located on North Wilson Boulevard in Arlington County, Virginia. Each brother contributed equal parcels of land, on each of which was a house. Jack had acquired his by a gift from his father and Ashton had purchased his from his father. The total area of these adjoining properties was 27,741 square feet. In the same year the partnership borrowed $5,000 from the First National Bank of Alexandria, Virginia, which it used to purchase an adjoining piece of property consisting of several lots and improved with a house. These three properties were rented during the period 1937 to the date of their disposition in 1939. The foregoing transactions were the only ones involving the acquisition or sale of real estate by the partnership during 1937. In 1938 the partnership acquired a two-thirds undivided interest in property on North Glebe Road in Arlington, and the partnership sold one of the houses and 10,198 square feet of the North Wilson Boulevard property. These *397 were the only transactions of the partnership involving purchase or sale of real estate in 1938. In 1939 the partnership acquired the remaining one-third interest in the Glebe Road property. This had been improved with a store which was rented in that year. In 1939 the partnership sold 3,064 square feet and 3,885 square feet of thehe North Wilson Boulevard property. The selling price of the former was $3,064, resulting in a gain of $1,871.52. The selling price of the latter was $3,885, resulting in a gain of $2,228.23. Also in 1939 the partnership acquired a lot in Lee Heights for $584.62. The foregoing were the only transactions of the partnership in 1939 involving sale or acquisition of real estate. During the years 1937 to 1939, inclusive, Jack and Ashton were full-time employees on a salary basis of the firm of Geo. H. Rucker Co. of which their father was a principal member. The partnershipdid not maintain any separate offices to conduct its transactions. In 1937 Ashton was 28 years old and Jack was 23. They both held licenses as real estate salesmen; Geo. H. Rucker Co. had a broker's license. The Geo. H. Rucker Co. was engaged in the business of real estate, loans, and insurance. *398 Ashton and Jack devoted practically all of their working time to the Rucker Company. The partnership took but little time; its books were kept by Ashton in the evening and on Sunday afternoons. One of the three properties acquired by the partnership in 1937 was corner property and had a frontage on a proposed Fairfax Drive as well as on Wilson Boulevard. The other properties had a rear "frontage" on the proposed Fairfax Drive. The purchase of the adjoining property with the $5,000 loan in 1937 gave the partnership the entire block of property, with the exception of one corner which could not be acquired. At the time of acquisition petitioners thought that the location was a "key" one with great possibilities for future value and income production; that it was good property for a long-term investment; that Fairfax Drive would be improved, and that its improvement would result in a sharp rise in value of the properties in question; that the business area of Clarendon was moving in the direction of the property; that it was a bit too early to do so, but that they could build stores on the property and keep it for investment; that they might obtain their future financial independence *399 by renting such stores and building up the assets of the partnership. The primary purpose in acquiring the three adjoining properties in 1937 was for investment. The sale of part of the Wilson Boulevard property in 1938 was made after a broker approached petitioners. Petitioners had not actively tried to sell the property. They never made active efforts to sell any of the partnership property or discuss its sale. It was represented that stores would be built. The sale in question was in 1939 and was of parts of the Wilson Boulevard property. It was also the result of offers presented by the purchaser, and it was also represented that a store would be constructed on the property, which petitioners thought would be to their advantage. No provision covering the construction of a store was put into the contract. Petitioners were satisfied to sell without obligating the purchaser to build stores. They took his statement in good faith, knowing that the purchaser might change his mind or be prevented from building. Petitioners' reason for making the sale was the partnership's need of money to hold the rest of its property, and the above-mentioned representation that a store would be built. *400 In 1941 the purchaser of one of the parcels built some stores on the property. No stores were built by the other purchaser. Petitioners foresaw as early as 1937 that they would probably need additional funds. They knew that they could have obtained whatever money was necessary to finance the property from their father. They were not at the point of losing the property in 1939, and they could have carried it. The partnership was motivated in selling the property sold in 1939 because of the price offered. They would have sold it from the beginning if they had been offered a sufficiently attractive price. The receipt of the offer in 1939 was not particularly surprising. The partnership in 1941 built a store on their remaining Wilson Boulevard property at a cost of about $190,000, which they leased to Sears, Roebuck for 15 years. The partnership return for 1939 shows income of $186.34 from interest and $3,457.16 from rents; and deductions for taxes, interest, repairs, depreciation, and "other deductions" aggregating $3,213.33, resulting in ordinary net income of $430.17. On their respective returns petitioners reported the gain on the sale of property in 1939 as capital gain. Respondent, *401 in determining the deficiency, treated it as ordinary gain. Opinion The profit which petitioners derived from the sale of real estate is a capital gain within the meaning of section 117(a), Internal Revenue Code, even though they were engaged in the real estate business, if the property in question was not held primarily for sale. In the light of the record it might be difficult to hold that petitioners through their partnership were not engaged in the real estate business. They pooled their interests in a common venture with the purpose of making profits, and filed a partnership return of the income so received. In that return, the line opposite "Business or Profession" is left blank, but if it had been filled in, it is difficult to see how anything other than "Real Estate" or some similar term would properly be employed. And the testimony shows that their purpose was to build up the enterprise so that aside from any other interests it might be the source of their future financial independence. As the case is presented, however, we do not reach that question for respondent concedes in his brief that "the testimony shows that the primary purpose of petitioners in acquiring this *402 property may have been for investment." It is not clear whether the word "primary" is intended to mean "original" or "principal," but at any rate it is the word the statute employs. The sole argument on this branch of the case is that notwithstanding such a "primary purpose," there was a subsequent change in the motivation with respect to the property which was sold. We may accept the assertion that since the legislation uses the term "held," it is material to ascertain the intention governing the parties in their continued ownership, as well as in the original purchase. Richards v. Commissioner (C.C.A., 9th Cir.), 81 Fed. (2d) 369. But there is no evidence here save the sale itself which indicates a change in the attitude of the owners or their purpose in holding the property. No efforts were made at any time to sell the property or list it for sale. Its sale was not discussed. Apparently, no price was set. The initiative came from the prospective buyer, and we think it may fairly be said that, as far as the record goes, it was his intention to purchase, rather than that of petitioners to sell, which resulted in the ultimate sale. And the mere fact *403 of sale cannot be sufficient to demonstrate the purpose of the prior holding, for if this were so, there never could be a sale of a capital asset by a business enterprise. Once it is conceded that the primary purpose was to hold the property for investment, the record requires the conclusion that the situation was no different when it was sold. Cases dealing with real estate subdivisions are clearly beside the mark. E.g. Neils Schultz, 44 B.T.A. 146 (appeal dismissed, per curiam (C.C.A., 9th Cir.), 123 Fed. (2d) 1020); A. R. Calvelli, 43 B.T.A. 6; Julius Goodman, 40 B.T.A. 22. Property involved in such activity is ordinarily held primarily for sale. The question then arises whether there is a sufficient frequency and continuity to constitute a business. In some instances that characteristic is found to be lacking and even where the primary intention to sell is inescapable, the property may yet be held to constitute a capital asset. E.g. Phipps, et al., Commissioner (C.C.A., 2nd Cir.), 54 Fed. (2d) 469. Here we have the converse *404 of that class of situation, where even though the transaction occurred in the operation of a business, the original and principal investment purpose precludes any finding that the property was held primarily for sale. Since the real estate in question falls within the statutory definition of capital assets, the profit resulting from its sale was properly reported as capital gain. Decisions will be entered under Rule 50.